

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLT                                        *271 Cadman Plaza East*
F#2010R00245                               *Brooklyn, New York 11201*


                                           January 10, 2010


<u>By ECF and Hand</u>

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            Re:  United States v. Christopher Barret et al.
                 <u>Criminal Docket No. 10-809 (S-4) (KAM)</u>

Dear Judge Matsumoto:

        The government respectfully submits this letter in
response to the objection by defense counsel in the above-
referenced case to the government's admission of certain text
messages containing threats made by un-apprehended members of
Barret's criminal enterprise against an individual they believed
were responsible for the arrest of Barret and many of his crew
members.


        A.   The Text Messages Are Admissible as Co-Conspirator
             <u>Statements Pursuant to Fed. R. Evid. 801(d)(2)(E)</u>

        "Rule 801(d)(2)(E) provides that '[a] statement is not
hearsay if [t]he statement is offered against a party and is
. . . [made] by a coconspirator of a party during the course and
in furtherance of the conspiracy.'" <u>In Re Terrorist Bombings of
U.S. Embassies in East Africa</u>, 552 F.3d 93, 137 (2d Cir. 2008)
(<u>quoting</u> Fed. R. Evid. 801(d)(2)(E)).  In order to admit co-
conspirator statements, the proponent of the evidence must
demonstrate, by a preponderance of the evidence, that:

(1) a conspiracy existed at the time of the statement;

(2) the statement must have been made in furtherance of the conspiracy; and

(3) both the declarant and defendant against whom the statement is offered were members of that conspiracy;

See Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); United States v. Almeh, 341 F.3d 167, 176 (2d Cir. 2003).  There is no requirement that the person to whom the statement is made must be a member of the conspiracy.  See In Re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 139 (2d Cir. 2008).

In making this assessment, the district court must consider the contents of the out-of-court statement for which admissibility is sought, in determining "the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered. . . ."  Rule 801(d)(2)(E); Bourjaily, 483 U.S. at 181.

In addition to proof contained in the subject statements themselves that the defendants and the declarants were members of the charged conspiracy, the Government need only adduce some evidence sufficient to show a mere "likelihood of an illicit association between the declarant and the defendant," United States v. Ragland, 375 F.2d 471, 477 (2d Cir. 1967); see also United States v. DeJesus, 806 F.2d 31, 34 (2d Cir. 1986). Indeed, proof of the illicit association may be "totally circumstantial."  United States v. Ragland, 375 F.2d at 477.

Moreover, where the out-of-court statements themselves "convincingly implicate[] the defendant" in the conspiracy, "a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting" evidence pursuant to Rule 801(d)(2)(E).  United States v. Padilla, 203 F.3d 156, 162 2d Cir. 2000).

In this case, the proffered text messages "convincingly implicate" the hearsay declarant and defendant BARRET in the charged criminal conspiracy.  The messages explicitly state that BARRET, also known as "Mouthy" and "Big Man," had ordered the witness' death and had sent members of his organization that remained on the street to locate and murder the witness.  The hearsay declarant states in several different messages that he and the others carrying out the threats were acting under

2

BARRET's orders.  The declarant further states that not all of the members of BARRET's organization were arrested.  Finally, the declarant accuses the recipient of the text messages of setting "us" up – an unequivocal statement implicating himself as a member of BARRET's organization:

- "You a big drug man in Queens and the Bronx.  You set us up, pussy.  The second the Man (BARRET) was gone you came home."

- "Yo keep running.  Big Man (BARRET) want you killed."

- "Not everyone got caught.  We know you are the one."

- "tell us where you are and what you did"

- "You set up Mouthy (BARRET) and his guys.  Your baby mother tell Mouthy's people that it was your plan cause we found out"

- "Tell where you are and stop fucking around.  You set up Mouthy and his men."

- "We're on the block looking out for you.  They know you're running.  You're a pussy."

- "Boy answer your phone. Big Man (BARRET) want to know if I find you."

- "We just leave Yonkers.  We rang the doorbell.  Mouthy in jail and you're still running."

- "We know you're the one who did it.  Why has Mouthy get arrested and you come back."

- "we are the ones doing the Big Man's work."

- "Yo every man knows it's you and your son's mother outed you.  I'm talking about they are going to die. We know your working with the 'boys' (police) but for how long"

The timing of the messages strongly corroborates that the declarant is a member of the conspiracy.  The potential witness started receiving threats on the evening of October 7, 2010 – mere hours after BARRET and seventeen members and associates of his criminal enterprise were arrested.  The messages continued every day – often multiple times per day –

until October 22, 2010, the date that JERMAINE THOMPSON met with Postal Inspector James Buthorn at the police precinct to seek protection from members of BARRET's crew who remained at large. Indeed, several of the threatening messages were sent to the telephone <u>while</u> Inspector Buthorn was reviewing its contents.

Testimony from several cooperating witnesses will establish that a number of members of BARRET's organization escaped arrest on October 7, 2010 and remained at large. Indeed, one obvious member of the charged conspiracy – OMAR MITCHELL – was not even arrested until close to a year after the initial raid on October 7, 2010.

Threatening text messages sent to the potential witness within weeks of BARRET's arrest revealed that BARRET,:

- "You a big drug man in Queens and the Bronx. You set us up, pussy. The second the Man (BARRET) was gone you came home."

- "Yo keep running. Big Man (BARRET) want you killed."

- "Not everyone got caught. We know you are the one."

- "tell us where you are and what you did"

- "You set up Mouthy (BARRET) and his guys. Your baby mother tell Mouthy's people that it was your plan cause we found out"

- "Tell where you are and stop fucking around. You set up Mouthy and his men."

- "We're on the block looking out for you. They know you're running. You're a pussy."

- "Boy answer your phone. Big Man (BARRET) want to know if I find you."

- "We just leave Yonkers.   We rang the doorbell.   Mouthy in jail and you're still running."

- "We know you're the one who did it.   Why has Mouthy get arrested and you come back."

- "we are the ones doing the Big Man's work."

- "Yo every man knows it's you and your son's mother outed you.   I'm talking about they are going to die.   We know your working with the 'boys' (police) but for how long"


B.      The Evidence is Not Unfairly Prejudicial

As the Second Circuit explained in United States v. Tracy, 12 F.3d 1186, 1195 (2d Cir. 1993), "[e]vidence of threats of death is subjected to the same Rule 403 balancing test as other relevant evidence."   While "the government must have an important purpose for [such] evidence in order to satisfy the Rule 403 balancing test[,] ... death threats, just as other potentially prejudicial evidence, are to be judged by the normal process of Fed.R.Evid. 403 balancing" and may only be excluded if their probative value is "substantially outweighed by the danger of unfair prejudice."   United States v. Qamar, 671 F.2d 732, 736 (2d Cir. 1982).

As an initial matter, the Court has already ruled on the admissibility of this evidence under Rule 403.   In a Memorandum and Order filed December 21, 2011, the Court held that the government could introduce into evidence "Barret's post-arrest orders to non-incarcerated members of his crew to 'find out who the "snitch" was that gave him up' and threats made to those who were believed to be cooperating with the government." United States v. Barret, 2011 WL 6704862, *9 (E.D.N.Y. Dec. 21, 2011).   The Court went on to reason that the threats "are overt acts performed in furtherance of the because they [were] . . . motivated by a desire to protect or enhance the conspiracy."   Id. (quoting United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008) ("[A]dvancing the aim of a narcotics conspiracy can involve performing ancillary functions such as ... enforcing discipline and chastising rivals."); see also United States v. Quinones, 511 F.3d 289 (2d Cir. 2007) (Raggi, J.) (upholding district court's admission of evidence that defendant threatened the lives of two informants).

Indeed, in the same opinion, the Court further held that "evidence of an order from Barret to his soldiers to murder one of Barret's rivals" – including evidence that "the rival and his driver were shot during the course of the attempted murder" were admissible as "direct evidence of the conspiracy" because the attempted murder evidence "shows the nature and existence of the conspiracy as well as Barret's leadership in the organization." Id. at 6 (citing United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (finding no abuse of discretion in district court's conclusion that proof of murders of persons considered to be threats to the gang was "relevant to show the existence and nature of the enterprise and the conspiracy"); United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (finding uncharged murders and threats relevant to demonstrate defendant's alleged leadership role)).

The Court found that the probative value of the above-described murder plot and attempted assassination outweighed the risk of prejudice because it did not involve conduct that was "more serious that the charged crime." Id. at 7. Surely a death threat that was actually acted upon is far more serious than an unfulfilled one.

Morever, the potential prejudice can be mitigated by a proper limiting instruction. See Quinones, 511 F.3d at 310 (citing Qamar, 671 F.2d at 736–37 (noting that district court limited potential prejudice from death threat evidence by instructing jury that it could be used only for specified purposes).

## <u>Conclusion</u>

   For all of these reasons, the Court should deny defendants' motion to preclude the government's proffered evidence of threats made by co-conspirators acting under the orders of Christopher Barret.


           Respectfully submitted,

           LORETTA E. LYNCH
           United States Attorney


By:     /s/_____
           Steven L. Tiscione
           Tyler J. Smith
           Gina M. Parlovecchio
           Assistant U.S. Attorneys
           718-254-6317/6186/6228

cc: Clerk of Court (KAM)
   All Defense Counsel (by ECF)

7